JUMP, APPELLEE, *v.* THE CITY ICE & FUEL CO., APPELLANT.

(No. 7579—Decided June 23, 1952.)

*Messrs. Hoover, Beall, Whitman & Eichel,* for appellee.

*Messrs. Marble & Vordenberg* and *Mr. Edward A. Burke,* for appellant.

HILDEBRANT, P. J. A jury in the Court of Common Pleas found plaintiff entitled to participate in the workmen's compensation fund for the death of her husband.

The principal contention on this appeal is failure to prove that the injury resulting in the death occurred

in the course of and arose out of the employment. The burden of so proving rests upon the plaintiff.

*Stevens* v. *Industrial Commission,* 145 Ohio St., 198, 61 N. E. (2d), 198, pertinent to the requirements of proof in such a case, states in the syllabus:

"1. Where an employee is killed during working hours at a place distant from the locus of his employment or the situs of his duties, there is a presumption, in the absence of evidence to the contrary, that his death did not occur in the course of and arise out of his employment within the meaning of the Workmen's Compensation Act.

"2. In a proceeding to recover workmen's compensation, the burden of proof is upon the claimant to show that the injury to or death of the employee occurred in the course of and arose out of his employment.

"3. It is the duty of a party on whom the burden of proof rests to produce evidence which furnishes a reasonable basis for sustaining his claim. If the evidence so produced furnishes only a basis for a choice among different possibilities as to any issue in the case, he fails to sustain such burden."

Plaintiff's decedent was employed by the defendant as a night supervisor between the hours of six p. m. and six a. m. His regular employment required him to report for work at the head office and manufacturing plant of the company located on Livingston street, and known as station No. 8, where he received instructions concerning the night duties either orally from the day superintendent, who was his immediate superior, or in writing, when, as frequently happened, the day man had left before decedent's arrival at station 8. He supervised the supply and servicing of some seven substations located in the downtown area of the city, including the west end basin area, lying between the

Eighth street viaduct to Price Hill and John street on the east, and including substation No. 54, located in the Southern Railroad yards to the west of the Union Terminal, access to which was from Gest street, causing the station to be referred to colloquially among defendant's employees as "Gest street."

In traveling from his house in Price Hill to report for work at station 8; he customarily boarded a streetcar at Eighth and Elberon, which would proceed eastwardly over the Eighth street viaduct, and on Eighth street to its junction with John street, where he would transfer and proceed northwardly on John street, a distance of some 16 blocks to Livingston street, within a half block of station 8 located thereon. About midway between Eighth street and Livingston street, John street crosses Lincoln Park driveway.

It is not disputed that plaintiff's decedent was fatally injured at approximately 6:20 p. m., on the evening of December 28, 1948, as a pedestrian being run down by a motor vehicle on the westerly crossing of John street across Lincoln Park drive in the northwest quarter of the intersection.

He was last seen alive by his son to whom he called a personal word while running to catch his street car at about 5:20 p. m., as claimed by plaintiff, or 5:40 p. m., as claimed by defendant; the dispute as to time not appearing vital to the court. Within the hour, he was found fatally injured at the John street, Lincoln Park drive intersection.

If he was killed while on the way to work, the claim is not compensable. If killed after having reported to work, either at station 8 or elsewhere at a substation, the claim is compensable.

While admittedly a variation from regular routine, plaintiff sought to show that decedent, with the employer's acquiescence and knowledge, at times went

first to Gest street to check the needs of that station, and plaintiff's theory is that decedent went first to ''Gest street,'' also known as station 54, in the Southern Railway yards, and then proceeded via a path through the yards to the Union Terminal, where he boarded a bus from which he alighted at the fatal intersection and thus was en route between the stations after having checked on ''Gest street,'' and thus was injured while in the course of his employment. Plaintiff contends this is the only theory consistent with decedent's being at the fatal intersection at all.

To establish the irregular practice of reporting first at Gest street on occasion, one Harris, a discharged former employee under decedent at station 8, testified as follows.:

''Q. And where—what plant did you work at?  A. Over on Livingston street.

''Q. And what were your hours?  A. From three to eleven-thirty.

''Q. At night?  A. Yes.

''Q. Were you acquainted with Heber L. Jump?  A. Yes, sir.  He was a night foreman.

''Q. Was he your immediate superior?  A. Yes. He took care of everything while he was around there.

''Q. He was your boss?  A. Yes, he was boss there when I was there.

''Q. And what were his duties as far as you could observe?  A. Well, he would go out and check different places where they were supposed to take ice to keep them filled and check the railroad yards for cars to be iced and took care of things around like that, see that trucks got out for their routes.

''Q. How many places would he have to check?  A. Well, there was station 54 and the passenger station, coach yards, and then he would have to go and check the Gest street cars, and out at Marshall avenue down in the bottoms.

"Q. And how would he get around to those different stations? A. They had a pick-up truck down to the ice plant that he always used.

"Q. Now, did you ever have occasion to answer the phone when he called in from one of those stations? A. That's right.

"Q. And what station would he have occasion to call in from? A. Well, he has called from station 54 down there.

"Q. Where is station 54? A. It's at Gest street.

"Q. Behind the terminal? A. Yes. It's back in there at the back of the terminal.

"Q. And is that the Southern Railroad yards? A. Yes.

"Q. And did you ever answer the telephone when he called in from down there before he came up to Livingston street? A. Yes, sir.

"Q. And was there any particular time of night that he would call in from down there or was it early in the evening or during the night or when? A. He had no certain time to call. When he checked these ice stations and they needed ice, why, if he had to go somewhere else to make another check, why, if it was really necessary the ice was took there, why, he called in and left orders for somebody to take a load of ice to that particular place.

"Q. Well, did he call you on the 28th of December, 1948, before he came to work on that night? A. Well, that I don't know whether he called or not. I wasn't in the state at that time.

"Q. Now did he ever on any other occasion call you from the Gest street station before he came up to Livingston street on his way to work? A. Yes, he has."

Plaintiff's son testified concerning a conversation had with the day supervisor, who was decedent's immediate superior;

"Q. Don, Mr. Marble asked you about your conversation with Mr. Vitt about your father's death. What was your conversation with Mr. Vitt about your father's death? A. Well, he come up to the house and he says he couldn't understand why he would be at John and Parkway unless he was coming from 54. He says he couldn't understand where he would be coming from, why he would be there, unless he was coming from 54 like he used to do many a night."

Plaintiff testified as to the statement of the day Superintendent, Vitt, as follows:

"Q. And what was the conversation that took place at that time, Mrs. Jump? A. Well, Mr. Vitt walked in, and he was very broken up. He was crying. He said he hated to hear about it. And I said, 'Well, Mr. Vitt, I can't understand what he was doing up there.' He said, 'Well, I can't either, Mrs. Jump, unless he had visited Gest street first.' That is what he said to me that night."

This is all the evidence offered by plaintiff tending to show a variation in practice of reporting for work by the decedent. There is no evidence that he went to station 54, or that he was seen there on the evening of the fatal injury.

At the call of the defendant, an employee subordinate to the decedent, and whose situs of employment was Gest street, or station 54, testified as follows:

"Q. Now, on December the 28th, 1948, were you there from seven in the morning until seven o'clock that night? A. Yes, sir.
"⸢* * *

"Q. Now, did you know Mr. Heber Jump? A. Yes, sir.

"Q. Do you recall the evening of December the 28th, 1948, when he was killed? A. Yes, sir.

"Q. You may state whether or not at any time that

evening, say from five to seven o'clock, he was in or about the Gest street yards?  A. No, I didn't see him; no, sir.

"Q. And you were there all the time?  A. Yes, sir.
"* * *

"Q. Did you see him at the Gest street yards?  A. Well, I have saw him there in the mornings, yes.  He would come over for a load of ice, and so I said, 'What you doing down there?'  And he said, 'I come over for this load of ice.'  And I said, 'Let me drive you home.'  But he said, 'I'm going to walk home.'  And I said, 'I'll be glad to drive you.'  And he said, 'No, I want the exercise.'

"Q. Now, did he use the company pick-up truck?  A. That's right.
"* * *

"Q. Now, you weren't in the city ice station there at all times during your 12 hours, were you?  A. Well, we was up on the platform back and forth; yes, sir.

"Q. I mean, when you weren't icing cars you didn't have to be right there, did you?  A. Well, sure, because I never knowed when something was coming in that we have to take care of it.

"Q. Well, you usually knew a half-hour or an hour in advance when a car was coming in?  A. Not all the time; no, sir.  Sometimes they don't give you any notice at all.  They shove them in there and wait till you ice them.
"* * *

"Q. Now, you said in your affidavit which you gave to the investigator that you had on several occasions seen Mr. Jump walking along Gest street—A. That's right.

"Q.—toward the Livingston street plant?  A. That's right, that's right, that's right.  And I offered to pick him up.  And he said, 'No; I walk all the way home. I walk for exercise.'  That's right.

"Q. Did you ever see him stop in the station there? A. No. I haven't; no, sir.

"Q. On his way over to Livingston street? A. No, sir, I haven't.

"Q. He could have, though, without you seeing him; is that right, sir? A. Well, I don't see how he could—

"Q. Well—A. If he come there, I probably would have seen him because we were right there and the boys all, too. If he would come around, he would probably look me up or something to tell me something. "* * *

"Q. Mr. Bennie, you stated a bit ago that on one or two occasions you saw him there in the morning? A. Yes, sir, that's right.

"Q. And I think you said he rode over on a—A. Truck load of ice.

"Q.—Truck load of ice and then walked home from that? A. That's right, that's right.

"Q. That was after he concluded his duties in the morning? A. That's right.

"Q. But you never saw him do that in the evening? A. No, sir; no, sir.

"Q. And you didn't see him at all on the evening of December 28, 1948? A. No, sir."

The record reveals that a pickup truck was available to decedent at station 8, and it was routine for him to use it in visiting the substations and it was routine for him to pick up reports of existing requirements, conditions of ice at the various substations near the close of his night's duties for the purpose of relaying them to the incoming day superintendent, either orally or in writing, in case he departed before the day man arrived.

The record reveals also that decedent had a penchant of walking for exercise when the opportunity was available to him.

It also appears that the icing requirements for car shipments of perishables handled at Gest street station 54 were at the lowest ebb of the year on Tuesday, December 28, 1948, as reflecting on the possibility of the decedent having stopped there before proceeding to his regular headquarters at station 8, on Livingston street.

The record shows further the seasonal darkness of the evening of December 28, 1948, and that it was wet and rainy.

. Does this state of the record balance and overcome the presumption existing against the claim and furnish a reasonable basis for sustaining the same?

Possibilities anent his being at the particular intersection at the time of being struck are several, to wit: 1. He could have alighted from the street car west of the Eighth street viaduct, and walked over Evans street, or a railroad right of way to Gest street, and thence to station 54. 2. He could have gotten off the street car at Harriett street, east of the viaduct, and walked three squares to the street named Gest, thence by bus to the point of the accident, in which event he had the opportunity of alighting at Linn street and Lincoln Park drive before ariving at the John street intersection, and walking an equal distance north to the Livingston street station. 3. He could have started walking from Eighth street to John street. 4. He could have stopped at Gest street or station 54 and proceeded by bus from the Union Terminal to Lincoln Park drive and John street, as plaintiff contends. 5. He could have walked right past Gest street or station 54 on his way to the Fruit Growers' Express office, where he was formerly employed, for some personal reason of his own.

The mention of the above possibilities does not exclude other hypotheses as to how he arrived at Lin-

coln Park drive and John street, which, while not obvious, might appear simple enough, if known.

It, therefore, appears that the record before us furnishes only a basis for choice among different possibilities as to why he was where he was when run down, and as to whether or not he was in the course of his employment.

Such being our conclusion, the plaintiff has failed to sustain the burden of proof incumbent upon her.

We find no other error apparent on the record, prejudicial to the defendant.

The judgment is, therefore, reversed, and the cause remanded, with instructions to enter final judgment for the defendant.

*Judgment reversed.*

HILDEBRANT, P. J., and MATTHEWS, J., concur.